15274

PACIFIC MILLS v. TEXTILE WORKERS' UNION OF AMERICA, LOCAL NO. 254 *ET AL.*

(15 S. E. (2d), 134)

*Mr. Malcolm McDonald,* of Boston, Mass., *Messrs. Elliott, McLain, Wardlaw & Elliott,* and *Messrs. Nelson, Mullins & Grier,* of Columbia, for appellant,

332

*Mr. John W. Crews* and *Mr. Fred D. Townsend,* both of Columbia, for respondent,

Reply brief for appellant:

June 4, 1941.

The opinion of the Court was delivered by MR. ASSOCIATE JUSTICE BAKER.

The dissenting opinion of Mr. Acting Associate Justice Thurmond gives the history of this litigation, and therefore need not be repeated here.

The "questions involved" in this appeal are stated by appellant to be:

"1. Is not a partial assignment enforcible only in equity?

"2. Will equity enforce a partial assignment where the enforcement thereof would impose substantial hardships on a debtor who has not consented to the assignment?

"3. Will the enforcement of the assignments under the facts of this case impose substantial hardships upon the debtor?

"4. Entirely apart from the question of validity of the assignments under the state law, do not the assignments violate the National Labor Relations Act and will not the Company by recognizing them be committing a prohibited unfair labor practice?

"5. If the enforcement of the assignments would compel the Company to violate the National Labor Relations Act, should not a court of equity refuse to decree their enforcement?"

The respondents raise no issue as to appellant's statement of the "Questions Involved," and "left-handedly" concur therein.

This Court has heretofore recognized the right of the assignee of wages due an assignor by an employer to enforce the collection of same against the employer in a Court of law where, from the conduct of the employer, the assumption arose that he had agreed to respect the assignment. *Bryant v. Askin & Marine Co.*, 146 S. C., 520, 144 S. E., 231. And in *Dunbar v. Johnston et al.*, 170 S. C., 160, 161, 169 S. E., 846, 847, it was held that an acceptance by the employer is not necessary to give complete effect to the assignment; "that wages or salary is a property right which may be assigned; and when such assignment is made and the employer has notice of it, *if no legal reason appears why it should not be given force and effect,* he will be bound by it, whether he accepts it or not." (Italics added.)

In both of the foregoing cases cited the assignments involved were partial assignments, but this issue was not raised, and therefore not passed upon; and the assignments were treated as though they were total assignments. In the first cited case, the employer had recognized the assignment and deducted from the wages of the employee the amounts stipulated in the assignment; and in the second cited case, it is stated in the opinion of the Court: "The employer offered no defense to the action except that it did not deem itself bound to respect the assignment and to pay the assignee, as directed, any portion of the wages of the employee as they accrued."

The opinion in the *Dunbar case* was written by Mr. Justice Stabler, afterwards Chief Justice, who with his usual farsightedness, no doubt anticipated that at some time there might come to this Court a case where the issue that a partial assignment was not enforceable at law would be made; and that such an assignment of wages would be potent only "if no legal reason appears why it should not be given force and effect."

The only contract involved in this case to which appellant is a party, is its contract to pay to its employees a certain compensation or wage for their services and under the law as it has been declared by our Courts, to pay the whole of said compensation or wage to either the employee or to any one assignee thereof, but there is no contract to pay except as a single act. In fact, appellant refused to enter into a contract with respondent, Union, as the bargaining agent for its employees which embodied the "check off" system; that is, the deduction from the pay of such employees as were members of respondent Union of the sum of $1.00 per month, and pay same over to the respondent union. For a Court to enforce such partial assignment of wages would be tantamount to compelling appellant to enter into a contract, or writing a clause into a contract to which appellant objects. It is the duty of Courts to enforce

contracts, but to refrain from making them. Stating the matter from another viewpoint, the enforcement of these partial assignments, and it is conceded by the parties to this action that the wage assignments involved are partial assignments, would be to force appellant to become the agent of such of its employees as are members of respondent Union and have executed a partial assignment of their wages to the Union, and also the agent of the respondent, Union, to collect from the one and to pay over to the other. The appellant has the legal right to refuse to accept such an agency even if it were offered compensation for the additional work thus devolved upon it. The appellant and the respondent, Union, one a private corporation, the other an association of individuals, occupy no different position from that of any other class of citizens in the eyes of the law in South Carolina.

While the Courts of this State recognize a partial assignment of a chose in action as an equitable assignment and will protect the assignee when they can do so *without working a hardship upon the debtor,* yet the enforcement of such partial assignment can only be had in a Court of equity. See *Carwile, Rec'r, v. Metropolitan Life Insurance Company,* 136 S. C., 179, 134 S. E., 285.

At the present time there has been filed with appellant approximately 1,100 of these partial assignments. Basing the calculation on 1,100 assignments, it is the finding of the Master, concurred in by the Circuit Judge, that it will require the services of or the additional work of one person an average of six hours per week to collect these dues.

The record discloses that at the time of the taking of testimony in this case, the respondent, Union, had an additional 300 of these partial assignments, and that it intends also filing these with appellant. And, of course, as the membership of respondent, Union, increases (appellant has 2,300 employees), additional assignments will be filed with ap-

pellant. And, correspondingly the burden and hardship increases.

Furthermore, if appellant can be compelled to recognize these partial assignments, either at law or in equity, then all other partial assignments which may be executed and delivered by appellant's employees would likewise have to be honored; and carried to a logical conclusion, appellant would have to do a banking business insofar as open checking accounts are concerned.

It will therefore be seen that aside from the possibility of making errors in the collection of these dues, for which appellant would be answerable, and the possibility of having to defend actions for wrongfully deducting dues where there is a dispute as to whether an employee has actually executed an assignment, the appellant would suffer financial burden and hardship if it be compelled to recognize these partial assignments, and this we hold, as a matter of law, would be a burden and hardship to which a Court of equity cannot lend its aid.

The principles underlying the foregoing discussion are too elementary and well settled to justify encumbering this opinion with further citation of authority.

In view of our holding herein, we see no necessity for entering into the legal maze which has been created by the decisions attempting to construe the National Labor Relations Act. We will therefore content ourselves with the statement that in our opinion, to force appellant to recognize these partial assignments would be against the spirit, if not against the letter of said Act. But we rest our conclusions on the consideration hereinbefore expressed.

It is our opinion that the decree appealed from should be reversed; that the assignments mentioned and described in the complaint in this action are void and of no effect insofar as appellant is concerned; that appellant is entitled to permanent injunctive relief against respondents undertaking to enforce same as against appellant in any Court of this State;

and that an order of injunction should forthwith issue from this Court in accordance with the views above expressed.

Reversed.

MR. CHIEF JUSTICE BONHAM, MR. JUSTICE FISHBURNE and MR. ACTING ASSOCIATE JUSTICE L. D. LIDE concur.

MR. ACTING ASSOCIATE JUSTICE J. STROM THURMOND dissents.

MR. ACTING ASSOCIATE JUSTICE J. STROM THURMOND, dissenting:

This is an action in equity, brought by the Pacific Mills (hereinafter called the company) against Textile Workers' Union of America, Local Number 254, Columbia, South Carolina (hereinafter called the union), and its president and vice-president, seeking relief by way of interlocutory and permanent injunction against the enforcement of certain wage assignments, hereinafter more particularly referred to.

The union was certified by the National Labor Relations Board as the exclusive representative of the production and maintenance employees of the company at its Columbia plants in February, 1938, and in July of that year, a collective bargaining contract was entered into between the company and the union for a period of one year. In the summer of 1939, negotiations looking toward the renewal of the contract or the making of a new contract began, and agreement was reached on many matters; but as a result of disagreement on other matters a strike occurred on August 18, 1939, and continued until October 14, 1939, during which period the plants remained closed and the company did not operate.

In September, 1939, a board of mediation, appointed by the State Commissioner of Labor, found that there were three principal issues involved in the strike, namely, annual vacations of one week with full pay for all employees, a wage increase, and the union's demand that the company agree to a "check-off" of union dues, which consists of the voluntary assignment by the employee of so much of his wages as may

be necessary to meet his union dues, and his direction to his employer to pay the amount to the treasurer of his union. *Gasaway v. Borderland Coal Corp.*, 7 Cir., 278 F., 56, 31 Am. Jur., 835.

In reference to the dispute as to the check-off, the majority of the board of mediation concluded that this method of collecting the union dues would be a convenience to the worker, but that this advantage is outweighed by the fact that the company would by the check-off system know who is or who is not a member of the union, and that the collection of the dues should be the sole responsibility of the union and its members, and should be no concern of the employer.

On October 15, 1939, the strike was terminated and the employees of the company returned to work, no agreement having been reached on the check-off dispute. On November 16, 1939, notice was given by the union to the company of 1,100 or more wage assignments, with the request that they be honored. Each of these wage assignments had been executed prior to October 15, 1939, by employees of the company who were members of the union, and each such instrument assigned, transferred and set over unto the union the sum of $1.00 per month of and from all wages and claims for wages, commissions, and monies for work done or to be done, due or to become due to the employee by or from the company, and also authorized and directed the company as employer to pay to the union the said sum of $1.00 per month out of the employee's said wages due or to become due as aforesaid, and to charge the same to the employee's account, payment to be made as and when the employee's wages are due him or at the option of the mills, not later than the 10th day of the next succeeding month; each assignment providing that the contract should be and continue in full force and effect for a period of twelve successive months from November 16, 1939.

The company declined to honor these assignments, and instituted this action by service of summons and complaint

on the defendants on December 6, 1939, to enjoin their enforcement. An injunction *pendente lite* was granted against suits on the assignments, and by the terms of that injunction the company was required to withhold wages in accordance with the terms of the assignments, from the assigning employees, pending the final order of the Court in this action.

The cause was referred by a general order of reference to Honorable Harry M. Lightsey, Master of Richland County, who took much testimony, and on June 27, 1940, reported to the Court, recommending that the assignments be held valid, and that the injunction sought be refused. The company's exceptions to the Master's report were heard by his Honor, Judge E. H. Henderson, who filed his decree on September 23, 1940, overruling the same and confirming the report, except as to certain assignments which had been executed by minors, which he held to be invalid and unenforceable. In his decree, Judge Henderson ordered the company to return to the minors the amounts withheld under their assignments, and to pay over to the union all other amounts withheld under the interlocutory injunction.

The company has appealed to this Court upon numerous exceptions, which present for decision the following questions:

(1) Are the assignments enforceable at law or only in equity?

(2) Has such hardship upon the debtor been shown as to entitle it to equitable relief from the enforcement of the assignments?

(3) Would the honoring of the assignments by the company constitute an unfair labor practice under the National Labor Relations Act?

Question one. Are the assignments enforceable at law or only in equity?

The validity of wage assignments is recognized in this State. *Bryant v. Askin & Marine Co.,* 146 S. C., 520, 144

S. E., 231; *Dunbar v. Johnston,* 170 S. C., 160, 169 S. E., 846.

In *Bryant v. Askin & Marine Co., supra,* it appeared that the employer had withheld a portion of the wages under the wage assignment, and also that evidence established acceptance by the employer. Under such circumstances it was held that the employer became the debtor of the assignee to the extent of the wages withheld.

In *Dunbar v. Johnston, supra,* the question considered and decided was whether the employer's acceptance is necessary in order to give complete effect to an assignment of wages, and it was held that such acceptance was not necessary, mere notice of the assignment being sufficient to bind the employer, whether he accepts it or not, if no legal reason appears why it should not be given force and effect. In that case there was no consideration of questions arising under partial assignments or assignments of future wages, either as to the nature of the right of, or the character of the remedy available to, an assignee under such assignments.

The assignments involved in the instant case are partial assignments, and at the commencement of this action were also assignments of wages to be earned in the future. While the validity of wage assignments is recognized in this State, it will be observed that this is the first case which involves a determination of the rights, liabilities and remedies of the several parties to partial wage assgnments and assignments of future wages.

In *Carwile v. Metropolitan Life Insurance Company,* 136 S. C., 179, 193, 134 S. E., 285, 289, the Court quoted with approval from 5 C. J., 894, the rule applicable to partial assignments, as follows: "At law, a partial assignment of a chose in action is not recognized unless made with the consent or ratification of the debtor. Courts of equity, however, have always recognized partial assignments of choses in action for many purposes, and will protect the assignees under

such partial assignments whenever they can do so without working a hardship upon the debtor."

And the Court adds: "The reason of the rule is that a creditor is not permitted to split up a single cause of action into many actions, without the consent of his debtor and thus subject him to annoyance and embarrassment not contemplated by his original contract."

See *Hughes v. Kiddell*, 2 Bay, 324 (in which the principle recognized by the Court in *Carwile v. Metropolitan Life Insurance Company, supra,* was applied in this State as early as 1801), and also, *Carwile v. Metropolitan Life Insurance Company,* 136 S. C., 111, 134 S. E., 275.

"The reason, and apparently the only reason, obtaining at law for refusing to enforce such an assignment, that if given effect the debtor would be deprived of the right to pay his debt *in solido* and might be subjected to many actions, embarrassments, and responsibilities not contemplated in his original contract, does not apply in equity, whose procedure contemplates that all persons at interest be made parties and have their rights determined by a single decree; consequently, in equity, the rule denying validity to such assignments ought not to, and generally does not, obtain." 80 A. L. R., 414, note.

The rule applicable to assignments of future wages has been succinctly stated by Judge Parker in *Seaboard Small Loan Corp. v. Ottinger,* 4 Cir., 50 F. (2d), 856, 857, 77 A. L. R., 956, as follows: "The rule is that an assignment of wages to be earned in the future is not good at law because ineffective to pass legal title, but will be enforced in equity. It is enforced in equity, not as a conveyance, *in praesenti* of what manifestly does not exist, but because it is regarded in equity as a contract to take effect and attach to the wages assigned as soon as they come *in esse*. Until the wages are earned, it is regarded as an agreement to convey; after that time as a conveyance."

In *Bryant v. Askin & Marine Company, supra,* 146 S. C., 520, 144 S. E., 232, in which the right to assign wages to be earned in the future, under a present contract of employment, was recognized, the Court said: "It is possible that under the case of *Parker v. Jacobs,* 14 S. C., 112, 37 Am. Rep., 724, the assignment would be deemed an equitable and not a legal one; but the distinction would be immaterial in the present case."

In *Parker v. Jacobs, supra,* the validity of a chattel mortgage on property of which the mortgagor neither had possession nor right to possession at the time, was considered, the Court held that, although in law it was necessary to the validity of the chattel mortgage that the mortgagor have a present property, either actual or potential, in the thing mortgaged, the rule in equity is different, and that in equity such a mortgage is effectual to charge the property as soon as it is acquired by the mortgagor and before possession is delivered to the mortgagee with an equitable lien.

A parallel situation is that presented in cases involving the assignment by an expectant heir during the lifetime of his ancestor of his expectant interest in the estate of such ancestor, whatever it may turn out to be on his death. It has been held in this State that such an assignment will be enforceable in equity, if shown to have been made in good faith and for a valuable consideration. *Blackwell v. Harrelson,* 99 S. C., 264, 84 S. E.; 233, Ann. Cas., 1916-E, 1263; *Wallace v. Quick,* 156 S .C., 248, 153 S. E., 168.

Under the applicable principles, in the case of either a partial assignment of wages, whether already earned or to be earned, or in the case of the assignment of wages to be earned in the future, whether partial or total, the right of the assignee is equitable. It appears to be well settled that both kinds of assignments are recognized and enforceable only in equity. In the instant case, the assignments involved are both partial assignments and assignments of future wages, and at the time of the commencement of this action

depended solely for their validity and enforcement upon the relief which the Court may grant in its equitable jurisdiction.

Question two. Has such hardship upon the debtor been shown as to entitle it to equitable relief from the enforcement of the assignments?

In the exercise of the equitable jurisdiction, and in the granting or withholding of relief in any particular case, the application of familiar principles makes it proper to take into consideration the hardship which may be imposed upon the debtor, the *bona fides* of the transaction, and the protection of the interests of the several parties in interest, all of whom may in such an action be made parties.

In *Hopkins v. Hopkins,* 4 Strob. Eq., 207, 53 Am. Dec., 663, legal choses in action assignable at law were sought to be enforced in equity by the assignees. Declaring that the purpose of the particular assignment had been to make the assignor a competent witness to establish the cause of action, where she would have been disqualified as a party in interest, the Court said: "Where there has been an assignment (for valuable consideration, or for the consideration of love from a parent to a child) of legal choses that are unassignable at law, this Court will entertain a bill in the name of the assignee for the enforcement of such claims; provided the assignor be made a party either as a complainant or defendant, and provided also there be *bona fides* in the transaction of the assignment. If the object be to obtain an unconscientious advantage over the party to be brought to the reckoning, the Court will not lend itself to the enforcement of the inequitable arrangement."

In that case it was held that the purpose of the parties to the assignment there considered was not in good faith to the defendant, and that the assignment would not be enforced in equity.

It was held in the case of *National Bank v. McLoon,* 73 Me., 498, 505, 40 Am. Rep., 388: "In equity, the interests of all parties can be determined in a single suit. The debtor

can bring the entire fund into Court, and run no risks as to its proper distribution. If he be in no fault, no costs need be imposed upon him, or they may be awarded in his favor. If he be put to extra trouble in keeping separate accounts, he can, if it is reasonable, be compensated for it. In many ways a Court of equity can, while a Court of law, with its present modes, cannot, protect the rights and interests of all parties concerned."

Applying these principles to the instant case, the question arises whether there is such a showing as to warrant the Court in denying enforcement of the wage assignments in question by granting the relief sought by the employer. It is urged by the company that hardship will be worked upon it in three particulars, namely, (1) that such enforcement will subject the company to considerable trouble and expense in making said money deductions from the assignors' wages, and will also possibly subject it to double liability; (2) that such enforcement will compel it to alter its established policy against the assignment of wages for any purpose by its employees; and (3) that enforcement of the assignments will compel the company to interfere with the labor relations of its employees.

Taking these up *seriatim,* we now consider the first particular of hardship. It appears from the record that the Master found "that to honor the assignments the Company's office force would be burdened with about six additional man-hours per week distributed throughout the payroll and records departments"; that the Master also found "that the wage assignment contracts in question were voluntarily executed with full knowledge of the contracting parties that they were for Union dues and were delivered to the Union for that purpose"; that the Master further found "each contract contested by the plaintiff in this proceeding appears to have been duly executed in the presence of a credible witness who signed as such," and that "less than a dozen employees have appeared in the proceeding as witnesses disputing the validity of their wage assignments." The findings of the

Master on these particulars have been confirmed by the Circuit Judge, and there is ample evidence to support them. Under these circumstances, it cannot be held that a showing of hardship, in the particular under discussion, sufficient to require relief against the enforcement of the assignments has been made.

In support of the next particular of hardship urged by the company, it is contended that the company has an established policy against honoring or permitting wage assignments by its employees for any purpose, and that the enforcement of the assignments in the instant case will interfere with the company's managerial authority and its right to conduct its business as it thinks best. It advances the belief that the assignment of wages by employees is often detrimental to their interests, and results is oppressive bargains being driven with them by an assignee, contends that the employer has a legitimate interest in objecting to wage assignments, and points out that if it be held that an employer can be compelled to recognize hundreds, perhaps thousands, of partial wage assignments for union dues, it will be difficult for such employer to continue the practice of discouraging wage assignments for other objects, and that such employer, against his will, may become faced with the necessity of making hundreds of periodical deductions in recognition of partial assignments for other things. It is also pointed out that in the instant situation, the ordinary method of discharging a wage assignment by the discharge of an employee is not calculated to be effective, because this is not a practical remedy where the union is a party to assignments covering its dues.

While it is true that there are hundreds of assignments involved here, there is only one assignment in the case of each assigning employee; and the situation is different from that which would be presented were any individual employee to issue multiple partial assignments of his weekly or monthly wages, thereby making his employer his banker and book-

keeper, with resulting inconvenience and hardship upon the employer. The number of assignments here involved comes from the fact that the company has hundreds of employees, as to whom it already has to keep many records; and to hold that the number of assignments here involved is a hardship upon the company would be equivalent to holding that a single partial wage assignment by an individual employee would be *per se* such hardship as to deny enforcement of such a single partial assignment, and such position is untenable. Nor does the honoring of wage assignments for dues in the union constitute a precedent which would interfere with its discouragement of partial assignments to "the butcher, the baker and the candle-stick maker."

The remaining particular of asserted hardship will now be considered. The company argues that, conceding the legality of honoring the assignments, nevertheless the effect upon its relations with its employees as a whole is calculated to be such as to entitle it to ask a Court of equity to relieve it from the duty of complying therewith. The company stresses its policy of neutrality in matters affecting the union activities of its employees, and contends that the honoring of wage assignments for union dues will make such a policy practically impossible. Wage assignments for dues, it is said, will keep the company constantly informed as to the union affiliations of its employees, whereas now, without knowledge of such affiliations, it cannot be suspected of discrimination; but with such knowledge it will be constantly under suspicion, and friction between it and its employees will be likely to result from the situation which will be created as pictured by the company.

The language of the Court in upholding the constitutionality of the provisions of the Railway Labor Act, 45 U. S. C. A., § 152, Fourth, prohibiting the deduction of union dues by employers from the wages of their employees is cited as cogent corroboration of the company's position, as follows:

"The deduction of dues payable to an organization from the wages of employees discloses to the carrier the affilia-

tion of employees with unions. It discloses which of them belong to a particular union. It may disclose which belong to a favored union and which do not belong to any union. It creates a contact in relation to the organization, and even though it is indirect and somewhat remote, it may detract from an element which is essential to success. Furthermore, it proffers an opportunity for the carrier to take into consideration the status of employees in respect to unions in connection with matters of promotion, discipline or dismissal. It is readily conceivable that, moved by a desire to avoid the displeasure of the carrier with the possible loss of employment, employees may be influenced to join a particular union or dissuaded from withdrawing membership. Congress may well have determined that the system could be resolved into a subtle device through which to trench upon the freedom of self-government of employees and in that way impede the success of the plan. Its interdiction has a real and substantial relation to the protection of interstate commerce." *Brotherhood of Railroad Shop Crafts of America, Etc., v. Lowden et al.,* 10 Cir., 86 F. (2d), 458, 461, 108 A. L. R., 1128, *certiorari* denied 300 U. S., 659, 57 S. Ct., 436, 81 L. Ed., 868.

It is obvious, however, that while such considerations may well warrant the legislative branch of the government in the enactment of a prohibitory measure, they would not authorize a Court of equity to enjoin the enforcement of assignments otherwise lawful and proper, merely because they are made to a union for the payment of union dues. If damage of the kind claimed by the company should result, it would be *damnum absque injuria,* and if the result is one which will promote industrial strife, it is a matter which should be handled by legislation applicable to all, and not left for determination by a Court of equity under the facts of each particular case. The alleged hardship upon which this contention is grounded is too intangible and speculative and remote to constitute the basis of equitable relief.

Question three. Would the honoring of the assignments by the company constitute an unfair labor practice under the National Labor Relations Act?

The company contends that by honoring the wage assignments for union dues it would be guilty of an unfair labor practice under the National Labor Relations Act, 29 U. S. C. A., § 158 (1), (2) and (3). Its argument treats the situation here presented as the equivalent of the check-off system, and urges that such system is invalidated by the Act.

It may be observed at this point that in the Railway Labor Act, *supra,* the collection of union dues by an employer covered by that Act is expressly made unlawful, while in the National Labor Relations Act this is not the case. Prior to the said Railway Act, the check-off system was not held to be illegal. *Gasaway v. Borderland Coal Corp., supra.*

In *National Labor Relations Board v. West Kentucky Coal Company,* 6 Cir., 116 F. (2d), 816, 822, the Court speaking of a check-off existing prior to the Act and continued thereafter, said: "When the check-off arrangement was made it was not illegal, not after the passage of the National Relations Act was it clear that such practice was unlawful. Certainly there is nothing in the Act to so characterize it."

In a number of cases where the evidence was held to show that the unions involved were company-dominated and orders to disestablish the unions were approved, the Courts disapproved as punitive, rather than remedial, the portions of such orders requiring the employers to repay to employees dues withheld and paid over to the unions. *National Labor Relations Board v. J. Greenebaum Tanning Co.,* 7 Cir., 110 F. (2d), 984; *Western Union Telegraph Company v. National Labor Relations Board,* 2 Cir., 113 F. (2d), 992; *National Labor Relations Board v. West Kentucky Coal Company, supra.* Compare *Republic Steel Corporation v. Na-*

*tional Labor Relations Board,* 311 U. S., 7, 61 S. Ct., 77, 85 L. Ed., ——, decided November 12, 1940.

In no decided case which we have found, or which has been called to our attention, has the collection of union dues been held to be an unfair labor practice *per se.* In *National Labor Relations Board v. Carlisle Lumber Company,* 9 Cir., 94 F. (2d), 138, the collection of dues and assessments for a company union was held to be one of the modes of discrimination in favor of such union against an employees' union and its employee members, but on the evidence there presented the practice was clearly in violation of Subsection (3) of Section 158 of the Act. And in *National Labor Relations Board v. J. Greenebaum Tanning Company, supra,* the Court referred to the check-off practice as being, at the most, merely incidental to an unfair labor practice.

Under the language of the Wagner Act, 29 U. S. C. A., § 151 *et seq.,* and under the decided cases, the determination of the question whether the collection of dues by the employer is an unfair labor practice would appear to depend on the facts and circumstances presented in each case. In the instant case, there is no evidence that the purpose or effect of the wage assignments is to interfere with the employees' right to bargain collectively, nor does it constitute or accompany any discriminatory practices or any interference with the union relations of any of the employees or any financial support of, or contribution to, the union. The result here complained of was brought about by the exercise by each of the assigning employees of the right to make wage assignments for a lawful purpose, and it does not appear that the actions of the employees or the result accomplished are rendered invalid by the application of the Wagner Act to the facts of this case, even if the situation be regarded as the equivalent in law of the check-off system. The assignments are not invalid as a matter of law, and we are convinced that it does not constitute an unfair labor practice under the National Labor Relations Act for the company to honor them.

We have carefully considered the record in this case and are convinced that the result of the decree of the Circuit Court was correct and should not be disturbed.

All exceptions should be overruled, and the judgment of the Circuit Court affirmed.